**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ELGENE KENTAY PORTER, #412934,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:14-cv-01798** |
| | ) | |
| **DEBRA JOHNSON, Warden,** | ) | **Judge Campbell** |
| | ) | |
| **Respondent.** | ) | |

## <u>MEMORANDUM OPINION</u>

Petitioner Elgene Porter, a state prisoner incarcerated at the Turney Center Industrial Complex in Only, Tennessee, has filed a *pro se* petition under 28 U.S.C. § 2254 (ECF No. 1), challenging his 2009 convictions in the Criminal Court for Rutherford County, Tennessee on charges of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. The petitioner also requests the appointment of counsel. The respondent has filed an answer in opposition to the petition, along with portions of the underlying state-court record. The petition is ripe for review.

As set forth herein, the Court will dismiss with prejudice all but two of the petitioner's claims: (1) that counsel was constitutionally ineffective for failing to argue to the trial court or on appeal that the petitioner's kidnapping convictions violated due process; and (2) that trial counsel was ineffective for failing to investigate and pursue relief on the basis of an alleged exculpatory statement made by the rape victim at the sentencing hearing. Regarding these two claims, the Court will appoint counsel for the petitioner, who shall investigate the claims and provide additional briefing to the Court. The respondent will be given an opportunity to respond.

## I. PROCEDURAL BACKGROUND

On May 14, 2009, the petitioner was found guilty by a Rutherford County jury on the charges referenced above (ECF No. 45-2, at 2–15 (verdict form)), and on July 20, 2009 he was sentenced to 3 years for conspiracy to commit aggravated burglary, 5 years for aggravated burglary and attempted aggravated robbery; and 22 years for aggravated rape, all to be served concurrently; and 10 years for each count of aggravated kidnapping, to be served consecutively to the remainder of the sentence and to each other, for

a total effective sentence of 42 years' incarceration. (ECF No. 45-2, at 38–44 (judgments).) The conviction and sentence were affirmed on direct appeal. *State v. Porter* ("*Porter I*"), No. M2009-02443-CCA-R3-CD, 2011 WL 915673 (Tenn. Ct. Crim. App. March 14, 2011), *perm. appeal denied* (Tenn. May 25, 2011).

The petitioner filed a *pro se* petition in the state court for post-conviction relief on August 5, 2011, which incorporated seventeen separate grounds for relief on the basis of ineffective assistance of trial and appellate counsel in an attachment entitled "Additional Grounds." (ECF No. 45-19, at 3–54.) The trial court appointed post-conviction counsel (ECF No. 45-19, at 63), who filed an amended petition. (ECF No. 45-19, at 73–77.) The amended petition claimed relief on the grounds of eighteen other instances of allegedly ineffective assistance of trial counsel.

The trial court conducted a hearing on March 26, 2012 (*see* ECF No. 45-20 (transcript)) and denied relief. (ECF No. 45-19, at 81–89.) That decision was affirmed on appeal as well. *Porter v. State* ("*Porter II*"), No. M2012-01139-CCA-R3-PC, 2013 WL 1197730 (Tenn. Ct. Crim. App. March 26, 2013), *perm. appeal denied* (Tenn. Sept. 11, 2013). The petitioner filed a petition to rehear, which the Tennessee Court of Criminal Appeals denied on April 11, 2013. (ECF No. 45-25.) The Tennessee Supreme Court denied review on September 11, 2013. (ECF No. 45-27.)

Petitioner Porter filed his petition under 28 U.S.C. § 2254, along with a supporting memorandum, in this Court on May 13, 2014 (based on the date-stamp by the prison mailroom, ECF No. 1, at 43). The respondent has filed an answer along with a complete copy of the underlying state-court record. The petition is timely, and this Court has jurisdiction.

## II.    STATEMENT OF FACTS

### A.    Facts Relating to Conviction

The Tennessee Court of Criminal Appeals summarized the testimony presented at a pretrial hearing and during trial as follows:[1]

> This case arises from a home invasion by three perpetrators on November 22, 2006. While robbery to recover a gambling debt was the apparent motive, one of the perpetrators sexually assaulted the female, adult victim ("the victim") during the home invasion. . . .

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

**Motion to Suppress Hearing**

Detective Jeff Peach of the Smyrna Police Department testified that, on April 16, 2007, he interviewed the Defendant. The Defendant was in custody at the Rutherford County Sheriff's Office for alleged offenses he committed in Murfreesboro. Detective Peach was joined by Detective John Liehr, also with the Smyrna Police Department, and the interview was videotaped. At the outset of the interview, Det. Peach read the *Miranda* warnings form to the Defendant, and the Defendant was allowed to read the form himself. The Defendant, af[t]er being asked if he understood the warnings, signed the form and agreed to speak with the officers. Detective Peach stated that he followed standard procedure in interviewing the Defendant, that he had no reason to believe that the Defendant did not understand his rights, and that he thought that the Defendant was familiar with the court system because he had a criminal record.

Detective Peach confirmed that he made reference to the Murfreesboro case during the videotaped interview, stating that he only did so in order to reassure the Defendant that they were not there to interview him on those crimes. Detective Peach testified that he never made any promises to the Defendant about the Murfreesboro case in exchange for his cooperation. He admitted that he did mention the district attorney to the Defendant: "Basically just that no promises about them. Just saying that at some point this would go to the district attorney. That he wanted to have his story out to us." Detective Peach also informed the Defendant that whatever information he gave would be turned over to the district attorney for review. Detective Peach said he never attempted to make a "deal" with the Defendant, and the Defendant did not seem confused about his authority, or lack thereof, to make a deal.

Detective Peach acknowledged that he spoke with the Defendant on a subsequent occasion in order to clarify conflicting information from the brothers about the existence of an additional participant in the home invasion. According to Det. Peach, this second meeting was very brief.

Detective Liehr confirmed that he participated in interviewing the Defendant and validated Det. Peach's testimony about the *Miranda* rights waiver form. Detective Liehr testified that he did not make any promises to the Defendant or encourage him to talk in exchange for help with the district attorney on the Murfreesboro charges. Detective Liehr also said that the Defendant never appeared to be confused, upset, or emotional during the interview. Detective Liehr substantiated that, shortly after interviewing the Defendant, they interviewed the Defendant's twin brother, Eugene. Despite the conflicting information about a possible fourth person, Det. Liehr opined that the two statements "basically mesh[ed] together" and were substantially true.

The videotaped statement was admitted as an exhibit to the hearing. During the interview, the Defendant also gave a handwritten statement that was recorded.

The Defendant testified that, prior to the videotaped statement, Det. Peach came to speak with him three or four times and did not give him any *Miranda* warnings. According to the Defendant, Det. Liehr would always bring up the Murfreesboro charges in these conversations, and he was confused because he did not "understand which one they was really trying to get at me with." The Defendant testified that he wrote the handwritten statement prior to the videotaped interview, that he did not understand what he was doing when he signed the waiver of rights form, and that he did not feel that he gave the statement freely and voluntarily. When asked why he did not feel his statement was voluntarily given, the Defendant replied, "Because for one they both was coming to me at a point where I'm in fear of another case." The Defendant testified that the detectives promised to "work with the DA" if he gave them information about the home invasion: "That he won't be looking at me no more and that he got who he wanted to get which was Von."

On cross-examination, the Defendant admitted that he had been arrested approximately twelve times, but believed he had been convicted only once for burglary of an automobile. He pleaded guilty to the auto burglary charge because he did not "understand what [he] was doing." The Defendant also testified that, even though he had been arrested twelve times, he had never been given *Miranda* warnings prior to this videotaped statement. Moreover, he did not remember the detectives reading his *Miranda* warnings to him at the beginning of his statement but acknowledged his signature on the rights waiver form. He did dispute the date on the rights waiver form, believing that he was interviewed on a different day. When asked about his education, the Defendant responded that he graduated from Riverdale High School "Special Ed."

The Defendant stated that, although he did not request a lawyer on the videotape, he had previously asked for one. The Defendant also testified that the handwritten statement he gave was false, that he had only known of the plan to recover a gambling debt from the victim's husband after hearing it from "Von." As the district attorney attempted to review more details of the statement with the Defendant, the Defendant asserted his Fifth Amendment right and refused to answer any more questions. The trial court denied the Defendant's motion to suppress.

## Trial

At trial, the State presented the victim as its first witness. On the evening of November 21, 2006, the victim and her two-year-old daughter (the "child victim") were at their home in Smyrna. Neither the victim's two stepsons nor her husband, a professional gambler, were at home that evening. Her husband had gone to play poker. After a routine evening, she and the child victim went to sleep in the victim's bed; between 1:30 and 2:00 a.m., she heard her small terrier barking. Believing it was her husband returning home, she got up out of bed, turned on the television so the barking would not wake the child victim, and then went to the bedroom door to let the dog out.

When she opened the door, she saw three men standing at the door pointing guns at her. According to the victim, two of three men were approximately the same height, and they were all wearing dark colored clothes, dark "hoodies," long-sleeved dark shirts, dark (black or navy) ski-masks, and basic wool, work gloves. The men pushed her to the floor in the doorway of her bedroom, and one man bound her feet, wrists, and mouth with duct-tape. The dog kept barking loudly, and another man began to beat the dog. Almost immediately, the men began demanding money. Although the men were mostly covered by their clothing, the victim was able to see that two of the assailants were dark-skinned and that the other assailant was lighter-skinned.

After beating the dog until he went "limp," one of the men carried the dog out of the room by the "nape of his neck[.]" One of the men placed pillows around the child victim on the bed in order to create "an enclosure" for her. The men continued to demand money, and two of the men began ransacking the house looking for money, while the other (a dark-skinned man) stayed and guarded the victim at gunpoint. While guarding the victim, the man fondled her, inserted his gloved finger into her vagina, ordered her to perform oral sex, and put his penis inside her vagina. He then placed the victim up on the bed with her daughter, who had begun to cry, and ordered her to use a vibrator on herself. As the men were leaving, they took a jar of money (containing approximately $50) and the victim's cell phone. They told the victim, "We're going another route. We're going to find your husband." The victim estimated that the ordeal lasted from one and one-half to two hours.

After the men left and some time had passed, the victim freed herself from the duct-tape, fled the residence with her daughter and dog, and went directly to the police station. At the police station, the victim detailed the incident to Officer James Ridley of the

Smyrna Police Department, who prepared a report. The victim was transferred to Stonecrest Medical Center where a rape kit examination was performed. Other than the color of their skin and the clothing they were wearing, the victim could not identify her assailants.

Detective Dustin Fait, also with the Smyrna Police Department, was called in as the crime scene investigator. He first went to the hospital, where he spoke with the victim, took some photographs of her, and collected the remaining duct-tape off her person. Detective Fait left the hospital and went to the victim's residence to collect additional evidence. Once there, he located some clothing (two ski-masks and one jacket) on a nearby street. The initial jacket and ski-mask were found very close to one another; the additional ski-mask was found a little further down the road. Inside the house, Det. Fait also found additional pieces of duct-tape, a vibrator, and pillows arranged on the bed in a "border of some sort." Detective Fait found a safe that had been opened and two jewelry boxes that had been pillaged. Detective Fait lifted some latent fingerprints from several locations in the house; however, to Det. Fait's knowledge, no fingerprints were identifiable.

After the Defendant was developed as a suspect in the home invasion, he was interviewed by Det. Peach and Det. Liehr. An edited version of the videotape was played for the jury. After initially denying any involvement in the crime, the Defendant stated that he was recruited to commit the robbery by a Laotian man named "Salon Von." During the interview, the Defendant admitted that he went inside the victim's house and that he fondled the victim's breasts and inserted his finger into her vagina. The Defendant also made a written statement detailing his participation in the home invasion. Both the videotaped and written statements were entered into evidence.

The rape exam did not reveal the presence of any sperm or semen. However, the Tennessee Bureau of Investigation's crime laboratory did match the DNA profile collected from a ski-mask at the crime scene to swabs collected from the Defendant and his twin brother (who, because they are twins, have identical DNA).

Following the conclusion of the proof, the jury found the Defendant guilty of conspiracy to commit aggravated burglary, aggravated burglary, attempted aggravated robbery, aggravated rape, and two counts of aggravated kidnapping. The Defendant was acquitted of the cruelty to animals charge.

*Porter I*, 2010 WL 1644969, at *1–4 (footnote omitted).

### B.    Post Conviction Evidence

The Tennessee Court of Criminal Appeals summarized the evidence presented during the post-conviction appeal as follows:

At the post-conviction hearing, the Petitioner testified that he never discussed consecutive sentencing with his attorney at trial ("trial counsel"). Had he discussed the possibility of consecutive sentencing, it might have impacted his decision to accept or reject the State's twenty-three-year plea offer. He could not state definitely, however, that such knowledge of consecutive sentencing would have caused him to accept the State's offer. He maintained that, even though he was present at the scene of the incident, he was not guilty. Additionally, the Petitioner denied that trial counsel explained to him that he might be required to serve his sentence at 100%. He estimated that he met with trial counsel approximately three or four times. He denied that trial counsel discussed the fact that, if he were to be convicted of these indicted offenses, he would be required to register with the sex offender registry and would be on lifetime community supervision. The Petitioner stated that, prior to the charges related to this case, he had a conviction for automobile burglary.

The Petitioner remembered discussing with trial counsel the videotape of the Petitioner's statement to police. According to the Petitioner, trial counsel was going to allow the Petitioner to view the video, but the Petitioner never saw it until trial. Trial counsel told him "he didn't have the correct means to play the videotape," so the Petitioner never saw it prior to trial. The Petitioner believed this videotape was instrumental to his conviction. On cross-examination, the Petitioner denied that the trial court viewed the videotape at the suppression hearing. The State asked the Petitioner, "Now, on the videotape you did admit to inserting your finger inside of the victim; is that correct?" The Petitioner stated that he was referring to a different case in the video. He acknowledged that the statement he wrote and signed for the police was true. On redirect examination, the Petitioner insisted that it was the redacted version of the videotape that he did not have the opportunity to view prior to trial.

The Petitioner denied that trial counsel discussed with him the elements of the offenses for which he was charged. However, on cross-examination, the Petitioner admitted that trial counsel explained to him what the State would have to prove. Regarding "alibi witnesses," he remembered giving trial counsel "a couple" names, but trial counsel did not call witnesses to testify for the defense at trial. The Petitioner specified that the alibi witnesses were his mother and brother, Taneisha Robinson and Davon Dodd. On cross-examination, however, he acknowledged stating on the video statement that both of these individuals were in the vehicle outside the house where the incident occurred. The Petitioner explained that these witnesses would have testified to the following:

As far as Taneisha, hers was like to the fact to where what she did and did not say to the detectives. . . . And Davon Dodd was going to be the witness on the clothes and the Sketcher shoes that the person had on, that the woman said who did this to her had on.

The State questioned the Petitioner regarding his assertion that these witnesses were "alibi witnesses." The Petitioner admitted to being present at the Smyrna residence when this incident occurred.

The Petitioner stated that, prior to trial, he never had heard of Josh [Blattner] or seen his statement. Although trial counsel filed a motion to suppress the Petitioner's statement, the Petitioner denied that trial counsel discussed this motion with him. The Petitioner made available to trial counsel his academic record because of his learning disability as well as the names of people who could discuss it, but to his knowledge trial counsel never spoke with such persons. He completed the twelfth grade and was enrolled in special education classes.

The Petitioner denied that trial counsel ever discussed with him a cigar found at the crime scene. On cross-examination, however, he could not explain the cigar's significance as to the case or this proceeding. He remembered that DNA evidence was presented at trial but never discussed the admissibility of such evidence with trial counsel prior to trial. He was unaware until after his conviction of other DNA evidence of which trial counsel was aware. The Petitioner recalled trial counsel filing a motion for new trial but did not know at what point trial counsel became aware of this DNA evidence. He denied discussing anything with trial counsel related to his motion for new trial.

On cross-examination, the Petitioner acknowledged that he was wearing a toboggan at the scene, but he did not believe the toboggan to be "good evidence" because the toboggan revealed the DNA of either the Petitioner or the co-defendant, given that they were twins. The Petitioner believed that a specialist could have analyzed the DNA to discern whose DNA was on the toboggan. He relayed the information about this specialist to trial counsel, but he stated that trial counsel did nothing with this information. As a result of all these deficiencies on the part of trial counsel, the Petitioner believed that his trial was "negatively impacted."

The State called trial counsel to testify. He estimated that he had represented criminal defendants in approximately one hundred trials throughout his career. When he began representing the Petitioner, he was aware that the Petitioner had charges pending not only in this case but also in Murfreesboro. Therefore, he discussed with the Petitioner the possibility of consecutive sentencing and the minimum and maximum sentences he could receive. Trial counsel also explained to the Petitioner the types of crimes for which he was indicted and that some of the crimes carried a required service at 100%. He told the Petitioner, however, that the Petitioner might be able to obtain credit up to 15% such that it was possible for the Petitioner to serve at 85%. He remembered meeting with the Petitioner on "several occasions." Trial counsel could not say with "100 percent certainty" that he informed the Petitioner about the lifetime sex offender registry or community supervision for life. He believed that he probably would have discussed it with the Petitioner when explaining the aggravated rape charge.

Regarding the Petitioner's videotaped statement, trial counsel remembered showing the Petitioner the tape using a laptop computer. Before meeting with the Petitioner, trial counsel reviewed the videotape to note items of concern for discussion, such as the Petitioner's "admission that he had actually performed a digital penetration of the victim." He also was concerned particularly with the Petitioner's indication that the "victim derived some sort of pleasure from that." Trial counsel could not recall whether the redacted version of the tape was played at the suppression hearing. He confirmed that he was aware that the videotape was redacted and noted that the redaction was at his request in order to remove references to the Petitioner's prior offenses. Trial counsel believed the videotaped statement to be "a crucial part of the case," which was why he sought to have it suppressed. He recalled telling the Petitioner, however, that suppressing the video would be difficult "because the officers conducted it in such a friendly manner."

Trial counsel testified that he reviewed with the Petitioner the charges for which the Petitioner was indicted. As to alibi witnesses, trial counsel stated that the Petitioner did not give him the name of Taneisha Robinson until trial. He recalled that the victim already "had testified that the person who had forced her to perform oral sex on him had on a pair of gray sweat pants." When trial counsel spoke with Robinson, Robinson informed trial counsel that she had seen the Petitioner on the night of the incident and that, when he left her residence, he was wearing boots and a gray sweat suit. Trial counsel then explained to the Petitioner that they could not call Robinson because she would confirm that the Petitioner was wearing gray sweat pants. On cross-examination, trial counsel clarified that the Petitioner gave him Robinson's name prior to trial but did not give him a phone number until the trial. He could not recall whether he reviewed a videotaped statement by Robinson prior to trial.

When trial counsel spoke with the Petitioner's brother about testifying, the brother told trial counsel not to call him because the Petitioner would not [sic] "not like what [he would] have to say." Accordingly, trial counsel did not call the Petitioner's brother to testify, either.

According to trial counsel, the Petitioner maintained until trial that he was not present at the residence where the incident took place. However, during deliberations, he heard the Petitioner tell a reporter "that the biggest mistake he made was going to the house that night." At that point, trial counsel realized that the Petitioner really had no alibi. Trial counsel agreed that the Petitioner's dishonesty with trial counsel hampered trial counsel's ability to defend the Petitioner. The Petitioner had told trial counsel that a third party was involved in the incident who never was caught and actually performed "all the bad stuff." Then, at the sentencing hearing, the Petitioner stated that he had fabricated that person.

The Petitioner's mother had informed trial counsel about the Petitioner's educational background and learning disability. As a result, trial counsel was particularly careful to help the Petitioner understand what he explained to the Petitioner. He knew that the Petitioner understood because the Petitioner would later relay the information to "other people."

Trial counsel stated that he discussed with the Petitioner the DNA on the toboggan matching the Petitioner and the co-defendant. He specifically remembered discussing that they could highlight to the jury the fact that "the State couldn't prove that it was him or his brother. Just one or the other." Trial counsel was not aware of technology that could differentiate the DNA of identical twins.

Regarding his overall representation of the Petitioner, trial counsel stated that he gave the Petitioner's case "a lot of attention." Because the Petitioner had never indicated that he wanted to do anything but try the case, trial counsel "attacked this case from the beginning as being a case that was going to be tried."

On cross-examination, trial counsel believed that the State "probably" made a plea offer but could not remember the specifics of the offer. However, he stated that "if there was an offer on the table [the Petitioner] knew about it." He did not recall the name, Josh Blackner [Blattner], or that this name was provided by the State with an attached statement. He also did not recall receiving a supplemental police report from the State notifying him of a cigar found at the scene. He recalled that the second toboggan and sweat shirt found had DNA not matching the Petitioner's DNA. He did not recall the DNA evidence revealing the presence of another person at the scene.

The post-conviction court denied the Petitioner relief, stating that the Petitioner failed to carry his burden of proof. The court stated, "I simply do not find your testimony credible in any way based on my recollection of what took place at the trial as well as your presentation today."

In its written order, the post-conviction court accredited trial counsel's testimony that he discussed with the Petitioner "consecutive sentencing, the statutory requirement of 100% service of certain counts of the indictment, and the elements of the offense." It also accredited trial counsel's testimony that he showed the videotaped interview to the Petitioner using trial counsel's laptop at the jail. Although trial counsel could not recall whether he discussed with the Petitioner the community supervision for life requirement, the post-conviction court once again found the Petitioner's testimony not credible and, therefore, found that the Petitioner failed to establish by clear and convincing evidence that they did not discuss this requirement. Alternatively, the court found that the Petitioner failed to establish prejudice by proving that, but for trial counsel's failure, the Petitioner would have accepted the guilty plea instead of going to trial. The post-conviction court noted that the Petitioner did not present evidence that he was offered a plea or what the specifics of that plea were.

Regarding the Petitioner's allegations that trial counsel was deficient in not calling Taneisha Robinson or Josh Blattner as witnesses, the post-conviction court noted that neither of these individuals was called to testify at the evidentiary hearing. The court determined that the Petitioner failed to establish deficient performance on the part of trial counsel in this regard or resulting prejudice.

The post-conviction court next addressed the Petitioner's contention that trial counsel failed to support his motion to suppress with a memorandum "based on the Petitioner's alleged inability to comprehend procedures and proceedings." The court found that the Petitioner failed to "submit his academic record" or "call any witness to testify regarding his alleged inability" or his academic record.

Finally, as to the Petitioner's claims regarding DNA evidence, the post-conviction court found that, because the Petitioner failed to support these claims with any evidence other than his own testimony, the Petitioner failed to establish these allegations. Thus, the post-conviction court denied relief. The Petitioner timely appealed, alleging ineffective assistance of counsel.

*Porter II*, 2013 WL 1197730, at *3–7 (footnote omitted).

## III.  ISSUES PRESENTED FOR REVIEW

The Court understands the petitioner to be raising a total of thirty-four claims of ineffective assistance of trial and appellate counsel.

First, the petitioner identifies the following eighteen claims of ineffective assistance of trial counsel as having been raised in the amended post-conviction petition filed by counsel (designated by the petitioner as Issues A through R):

(1) failure to inform petitioner concerning the possibility of consecutive sentencing (ECF No. 1, at 11);

(2) failure to inform petitioner that any sentence received for Counts 4, 5, and 6 would have to be served at 100%, pursuant to statute (ECF No. 1, at 11);

(3) failure to inform petitioner that lifetime registration and community supervision were statutorily mandated for Count 4 (ECF No. 1, at 11);

(4) failure to advise petitioner of the elements of the offense of aggravated rape and what the State would have to prove to support the charge (ECF No. 1, at 11);

(5) failure to advise petitioner of the elements of the offense of aggravated kidnapping and what the State would have to prove to support the kidnapping charges (ECF No. 1, at 11);

(6) failure to counsel petitioner regarding a redacted videotape of his police interview or to discuss the possibility of its being used as evidence, the redactions, or the videotape's potential effect on a jury (ECF No. 1, at 11):

(7) failure to offer the potentially favorable testimony of Taneisha Robinson regarding the petitioner's whereabouts after notifying the state of counsel's intent to use her as an alibi witness (ECF No. 1, at 12);

(8) failure to interview or offer the potentially favorable testimony of Josh Blattner regarding statements he made to the police on October 8, 2008 (ECF No. 1, at 14);

(9) failure to properly support a motion to suppress petitioner's statement to the police with an "appropriate memorandum" citing the best-evidence rule and referencing the petitioner's inability to comprehend proceedings and academic record (ECF No. 1, at 15);

(10) failure to investigate the presence of potentially exculpatory physical evidence found at the crime scene and recorded in Officer Jamie C. Murphy's October 2, 2008 report (ECF No. 1, at 17);

(11) failure to investigate the chain of custody of the evidence presented at trial (ECF No. 1,

at 18);

(12) failure to prepare for specific scientific evidence despite being on notice that the state intended to present the testimony of DNA experts (ECF No. 1, at 18);

(13) failure to challenge the sufficiency of the evidence by failing to prepare for DNA proof relating to "identical twins and the interchangeable nature of such evidence" (ECF No. 1, at 18);

(14) failure to conduct voir dire of State experts responsible for DNA testing (ECF No. 1, at 18);

(15) failure to "challenge the testimony regarding the combination of samples from the clothing, to get sample (sic) linking Petitioner to the items of clothing containing DNA" (ECF No. 1, at 18);

(16) failure to raise errors in the laboratory report regarding where items submitted for DNA testing were found and their proximity to the crime scene (ECF No. 1, at 18);

(17) failure to raise the issue of new DNA evidence in the motion for new trial "which would positively eliminate Petitioner as a donor of DNA presented as evidence at Petitioner's trial" (ECF No. 1, at 18); and

(18) failure to follow through with the issue raised in his motion filed December 5, 2008 and to file additional motions to conduct independent laboratory analysis (ECF No. 1, at 18).

In addition, the petitioner states an additional sixteen claims of ineffective assistance of trial and/or appellate counsel in this Court. These claims were presented in the petitioner's initial *pro se* post-conviction petition (ECF No. 45-19, at 3–54), filed prior to the appointment of counsel, and in his *pro se* motion for rehearing in the Tennessee Court of Criminal Appeals, after counsel failed to address them in the post-conviction hearing and or to include them as issues in the post-conviction appeal. The claims are as follows:

(19) whether trial counsel was ineffective for arguing at the suppression hearing that the petitioner's "post-indictment statement" should be redacted from the petitioner's videotaped statement to the police, but then failing to preserve that issue in his motion for a new trial and failing to raise the issue on appeal (designated by the petitioner as "Issue (1)") (ECF No. 1, at 19);

(20) whether trial counsel was ineffective for failing to object under Tennessee Rule of Evidence 404(b) to the statements obtained by Detectives Peach and Liehr in violation of *Massiah v. United States*, 377 U.S. 201 (1964) ("Issue (2)") (ECF No. 1, at 19);

(21) whether counsel "violated [the petitioner's] Sixth Amendment Rights to effective assistance of counsel at trial and on appeal; his right to a jury trial; his right to compulsory process; his fourteenth amendment rights to due process and a fair trial by failing to investigate and submit mental health and high school records . . . at the evidentiary hearing on the motion to suppress" ("Issues (3) and (4)" [sic]) (ECF No. 1, at 19–20);

(22) whether trial counsel was ineffective for failing to raise an objection under Tennessee Rule of Evidence 403 ("Issue (5)") (ECF No. 1, at 26);

(23) whether trial counsel was ineffective for failing to request that the prosecution elect which offense it was submitting to the jury ("Issue (6)") (ECF No. 1, at 26);

(24) whether trial counsel was ineffective for failing to object when the trial court improperly used Tennessee Rule of Criminal Procedure 24(f)(2)(a) and eliminated the only African American juror from the body of twelve deliberating and deciding the case ("Issue (7)") (ECF No. 1, at 26);

(25) whether trial counsel "was ineffective for failing to object to the jury selection process and argue that the State violated the Equal Protection Clause of the venires in Rutherford County, Tennessee, for a significant period of time, when one total population of Rutherford County to the proportion serving as jurors" [sic] ("Issue (8)") (ECF No. 1, at 27);[2]

(26) whether counsel was ineffective for failing to object to the jury selection process and to argue on appeal that the trial court failed to follow proper procedural rules in ruling on the *Batson* challenge ("Issue (9)") (ECF No. 1, at 27);

(27) whether counsel was ineffective for failing to argue at the sentencing hearing and on appeal, under the Fifth and Fourteenth Amendments, that the petitioner's multiple convictions should merge into one conviction ("Issue (10)") (ECF No. 1, at 27);

(28) whether counsel was ineffective for failing to argue at trial and on appeal that the evidence was insufficient to support the verdict because the only collaborating evidence to support petitioner's confession was a detective's testimony concerning the petitioner's police statement, which the petitioner claims was "unexplained, inconsistent and uncorroborated" ("Issue (11)") (ECF No. 1, at 27);

(29) whether trial counsel was ineffective for failing to object to the jury's hearing the redacted version of petitioner's police statements or to argue that the "best evidence rule" was violated when the jury heard the redacted version ("Issue 12") (ECF No. 1, at 27);

(30) whether trial counsel was ineffective for failing to object to the trial court's failure to follow the guidelines set forth in Rule 30.1 of the Tennessee Rules of Criminal Procedure when the trial court decided not to allow the videotaped interview of petitioner to go to the jury ("Issue 13") (ECF No. 1, at 27);

(31) whether trial counsel was ineffective for failing to require the trial court to give adequate jury instructions on the DNA evidence as it pertains to twins ("Issue 14") (ECF No. 1, at 28);

(32) whether trial counsel was ineffective for failing to appeal after objecting to the admission of Detective Liehr's testimony about his interview of Taneisha Robinson as hearsay evidence in violation of petitioner's Fifth, Sixth, and Fourteenth Amendment rights ("Issue (15)") (ECF No. 1, at 28);

(33) whether trial counsel was ineffective for failing to file a motion to stay while pursuing the "error coram nobis" issue regarding the an allegedly exculpatory statement made by the

---

[2] In his initial petition for post-conviction relief in the state trial court, the petitioner articulated this claim as follows:

> Defense counsel was ineffective for failing to object to the jury selection process and argue that the State violate[d] the Equal Protection Clause . . by excluding African American woemen from the venires in Rutherford County, Tennessee, for a significant period of time, when one compares the proportion of African American females in the total population of Rutherford County to the proportion serving as jurors.

(ECF No. 45-19, at 33.)

victim during the sentencing hearing ("Issue (16)") (ECF No. 1, at 28); and

(34) whether trial counsel was ineffective for failing to file a motion to stay the proceeding while pursuing an "error coram nobis" issue regarding the admissibility of additional DNA evidence ("Issue (17)") (ECF No. 1, at 29).

## IV.    STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court recently explained, AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. ----, 134 S. Ct. 10, 15 (2013). AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). That provision forbids a federal court from granting habeas relief with respect to a "claim that was adjudicated on the merits in State court proceedings" unless the state-court decision either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state-court decision is contrary to "clearly established federal law" under § 2254(d)(1) only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The Supreme Court has held that review under § 2254(d)(1) " is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. ----, 131 S. Ct. 1388, 1398 (2011).

And, as the Supreme Court has cautioned, "'a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'"

*Titlow*, 134 S. Ct. at 15 (quoting *Wood*, 558 U.S. at 301). Indeed, the Supreme Court repeatedly has emphasized that § 2254(d), as amended by AEDPA, is an intentionally demanding standard, affording great deference to state-court adjudications of federal claims. In *Harrington v. Richter*, 562 U.S. 86 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," then relief is precluded under that provision. *Id.* at 101 (internal quotation marks and citation omitted). The Court admonished that a reviewing court may not "treat[] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102.

## V.      EXHAUSTION AND PROCEDURAL DEFAULT

In addition to § 2254(d)'s limitations, AEDPA generally precludes habeas review of claims that have not been properly exhausted before the state courts or were procedurally barred by the state courts, except in very limited circumstances.

### A.      Exhaustion

Section 2254(b)(1) provides that a federal court may not award habeas relief to an applicant in state custody "unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State," "there is an absence of available State corrective process," or "circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). Exhaustion occurs once a petitioner has "give[n] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). If there remains a remedy under state law that a petitioner has not yet pursued, exhaustion has not occurred and the federal habeas court cannot entertain the merits of the claim. *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).[3]

When a habeas court finds a claim to be unexhausted, it can, for good cause, stay the action and permit the petitioner to present his unexhausted claim to state court and then return to federal court for review of his perfected petition. *Rhines v. Weber*, 544 U.S. 269, 277 (2005). The court need not wait for exhaustion,

---

[3] In Tennessee, review by the state supreme court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

however, if it determines that a return to state court would be futile. *See id.* ("[E]ven if a petitioner had good cause for that failure [to exhaust claims in state court], the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless."); *see also* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State").

### B.      Procedural Default

Even where a state prisoner has exhausted available state-court remedies, a federal court may not consider "contentions of federal law which are not resolved on the merits in the state proceeding due to [the petitioner's] failure to raise them as required by state procedure." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). In addition, if a petitioner failed to fairly present a particular federal habeas claim to the state courts but has no remaining avenue available for doing so under state law, then the claim is deemed to be exhausted but procedurally defaulted. *Boerckel*, 526 U.S. at 848; *Rust*, 17 F.3d at 160.

If a prisoner defaulted a federal claim in state court, review by the federal court is completely barred unless the petitioner demonstrates that (1) there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error, or (2) "failure to consider the claim would result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective-assistance claim was not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received

ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53 (1992) (holding that post-conviction attorney error was not cause to excuse a default under the circumstances presented there). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309, 1315, 1320 (2012) (creating an exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911, 1921 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective-assistance claims on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his *actual* and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental

miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496). This too is a very demanding standard, and not every claim of innocence will lead to review of a defaulted claim.

With these principles in mind, the court will turn to the examination of the claims raised in Porter's petition for habeas relief.

## V. ANALYSIS AND DISCUSSION

### A. Claims Raised by Counsel in the Amended Post-Conviction Petition

This Court's review of the record reveals that the petitioner's first eighteen claims were set forth in the amended petition for post-conviction relief filed by counsel and several of them, though not all, were also raised in the petitioner's post-conviction appeal and expressly rejected by the Tennessee Court of Criminal Appeals.

Each of these claims asserts a deprivation of the petitioner's Sixth Amendment right to the effective assistance of trial counsel. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that in order to successfully claim that a lawyer's assistance was so ineffective as to violate the Sixth Amendment a defendant must meet two requirements. "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 412 (2000); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2).

Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United

States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

Regarding those claims that were fully exhausted in the state courts, the Tennessee Court of Criminal Appeals correctly articulated the standard established by *Strickland* and discussed at some length the proof necessary to establish both prongs of the *Strickland* test. *Porter II*, 2013 WL 1197730, at *8. The court then proceeded to discuss the petitioner's claims in light of this standard and rejected them. Regarding those claims that were not raised in the appeal, the petitioner does not acknowledge that these claims are procedurally defaulted, nor does he present cause or prejudice to overcome the default of these claims, as discussed below.

### 1. Claims 1 and 2

In his petition in this Court, the petitioner states that trial counsel failed to inform him about the possibility of consecutive sentencing or to inform him that "the indicted offenses were such that 100% service of any sentence received regarding Counts 4, 5, and 6 was statutorily mandated." (ECF No. 1, at 11.)

At the post-conviction hearing in state court, the petitioner indeed testified that his trial attorney never discussed with him the possibility of consecutive sentencing or the fact that statute mandated serving 100% of any sentences imposed for convictions of rape or kidnapping. (Post-Conviction Tr. at 4–5, ECF No. 45-20, at 7–8.) The post-conviction court rejected these claims, expressly finding the petitioner's testimony not to be credible. He credited instead trial counsel's unequivocal testimony that he had discussed these issues with his client.

In its opinion, the Tennessee Court of Criminal Appeals ruled on all these claims as follows:

> The Petitioner first asserts that trial counsel failed to notify him adequately about the Petitioner's likelihood for consecutive sentencing or 100% service of his sentence. The post-conviction court, in its written order, accredited trial counsel's testimony that he discussed with the Petitioner "consecutive sentencing, the statutory requirement of 100% service of certain counts of the indictment, and the elements of the offense." Although the Petitioner claimed at the post-conviction hearing that trial counsel failed to discuss these issues, we will defer to the post-conviction court's credibility findings in these matters. The Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. Accordingly, the Petitioner is entitled to no relief on this basis.

*Porter II*, 2013 WL 1197730, at *9 (internal citations omitted).

In light of the evidence presented, the state court reasonably credited the trial attorney's testimony that he did discuss with his client the possibility of consecutive sentences and 100 percent service of sentences, and thus reasonably concluded that trial counsel was not ineffective in that regard. Because the state court's decision did not involve an unreasonable determination of the facts, the petitioner is not entitled to relief on the basis of these claims.

### 2. Claim 3

The petitioner asserts that trial counsel failed to inform him that "lifetime registration and community supervision are statutorily mandated for Count 4 of the indictment." (ECF No. 1, at 11.)

At the post-conviction hearing in state court, the petitioner testified that his trial attorney never discussed with him the requirement of lifetime registration on the sex-offender registry and lifetime community supervision in the event of a rape conviction. (Post-Conviction Tr. at 5, ECF No. 45-20, at 8.) The post-conviction court, however, expressly found the petitioner's testimony not to be credible. The court instead believed trial counsel's testimony that he had discussed these issues with his client, even though counsel was somewhat equivocal regarding whether he had informed his client about lifetime community supervision following any sex-related conviction:

> Q.      Did you ever discuss with him lifetime sex offender registry or the community supervision for life?
>
> A.      Now that I don't recall specifically. That's a very specific thing. I would say that I probably would have, but for me to be able to sit here and tell you for 100 percent certainty that I did, no, sir, I couldn't say with 100 percent certainty that I did.
>
> Q.      Would you have discussed that with him as part of your discussion of the aggravated rape charge?
>
> A.      Probably. Again, I just don't recall specifically the conversation.

(*Id.* at 40:10–23, ECF No. 45-20, at 43.)

In the petitioner's post-conviction appellate brief, the petitioner, through counsel, pointed to the testimony referenced above, but he argued only that "a lawyer's failure to advise his or her client about the mandatory lifetime community supervision sentence, where the client is considering a plea to one or more of the relevant offenses, is deficient performance," and that trial counsel in this case did not specifically recall whether he had discussed community supervision with his client. (ECF No. 45-21, at 9.) Regarding prejudice,

post-conviction counsel took issue with the trial court's conclusion that the petitioner had not offered evidence that, but for his trial counsel's failure to inform him about lifetime community supervision, he would have accepted the plea offer instead of proceeding to trial. He insisted that the testimony showed that his client's knowledge of all the information "would have impacted his decision of whether or not to consider the plea offer." (*Id.* at 14.)

At the hearing, the petitioner indeed responded affirmatively to the question: "Had you been aware of the nature of consecutive sentencing and a hundred percent service of sentence and the lifetime community reporting and lifetime registration if you were convicted, *would that have made a difference as to whether you considered the offer* that was made?" (Post-Conviction Tr. 30:7–13, ECF No. 45-21, at 33 (emphasis added).) However, the petitioner's concession that he would have "considered" the offer is not equivalent to testifying that he would have *accepted* the offer.

In its opinion, the Tennessee Court of Criminal Appeals ruled on this claim as follows:

> [T]he Petitioner contends that trial counsel failed to inform him that the convictions for some of his indicted offenses carried a requirement for lifetime sex offender registry and community supervision for life. The post-conviction court once again found the Petitioner's testimony not credible and therefore found that the Petitioner failed to establish by clear and convincing evidence that they did not discuss this requirement. Alternatively, the court found that the Petitioner failed to establish prejudice by proving that, but for trial counsel's failure, the Petitioner would have accepted the guilty plea instead of going to trial.
>
> Looking first to the prejudice prong, [i]n the context of a petitioner who seeks to reinstate (rather than withdraw) a plea offer, the petitioner must show that there is a reasonable probability that he or she would have accepted the plea had it been properly communicated to him or her.
>
> Here, we will look at whether the Petitioner would have accepted the State's plea offer had trial counsel informed him of the community supervision for life or the sex offender registry requirement. The Petitioner did not testify that he would have accepted the plea offer had he been informed of the community supervision for life requirement. On cross-examination at the post-conviction hearing, the Petitioner did not state definitively that knowledge of the consecutive sentencing requirement would have caused him to accept the State's offer. Additionally, trial counsel testified that, because the Petitioner had never indicated that he wanted to do anything but try the case, trial counsel "attacked this case from the beginning as being a case that was going to be tried." Moreover, because we do not know the specifics of the plea offer, we do not know whether the community supervision for life requirement would have been a component of the plea offer. The Petitioner has failed to establish that he was prejudiced in this regard. Therefore, we need not address the deficiency prong. Accordingly, the Petitioner is entitled to no relief on this issue.

*Porter II*, 2013 WL 1197730, at *9–10 (internal citations and quotation marks omitted).

As for the question of whether the petitioner was informed about the sex-offender registry and lifetime

community supervision for sex-related offenses, the state court's decision that the petitioner failed to establish prejudice did not involve an unreasonable application of *Strickland*. The two-prong *Strickland* test for ineffective assistance of counsel also applies to a defendant's challenge to plea-negotiations in a criminal prosecution. *Missouri v. Frye*, 566 U.S. ----, 132 S. Ct. 1399, 1405 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)). When a defendant challenges his attorney's performance as it relates to plea proceedings, the "first half of the *Strickland v. Washington* test is nothing more than a restatement of the standard of attorney competence" previously delineated by the Supreme Court. *Hill*, 474 U.S. at 58. "The second, or 'prejudice,' requirement, on the other hand, focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Id.* at 59. "In other words, in order to satisfy the 'prejudice' requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*; *accord Dando v. Yukins*, 461 F.3d 791, 798 (6th Cir. 2006) (quoting *Hill*, 474 U.S. at 59).

The state court reasonably determined, in light of the evidence presented in state-court proceedings, as set forth above, that the petitioner did not present evidence suggesting that, but for his counsel's failure to convey information about the sex-offender registry and lifetime community supervision, there was a reasonable probability that he would have accepted the plea offer. Instead, he agreed only that such knowledge would have affected his decision whether to "consider" the offer. The court also noted that the petitioner failed to present evidence regarding the details of the plea offer, including whether it required a guilty plea to the rape charge and thus itself would have entailed the same registration and supervision. The court's conclusion that the petitioner failed to prove prejudice, even assuming counsel was ineffective for failing to discuss these possible ramifications of the charges against the petitioner, was not unreasonable.

The petitioner is not entitled to relief on the basis of this claim.

### 3.    *Claims 4 and 5*

The petitioner argues that trial counsel was ineffective for failing to adequately advise him of the elements of the offenses of aggravated rape and aggravated kidnapping and what the state would need to prove to support these convictions (Claims 4 and 5)**.** The petitioner raised these claims in the initial-review post-conviction proceedings. (*See* Am. Post-Conviction Pet'n, ECF No. 45-19, at 74.) Although the petitioner was questioned about these issues at the hearing, the claims were not expressly raised in the post-conviction

appeal.

The Tennessee Court of Criminal Appeals referenced these claims when it summarized the evidence concerning them: "The Petitioner denied that trial counsel discussed with him the elements of the offenses for which he was charged [on direct examination]. However, on cross-examination, the Petitioner admitted that trial counsel explained to him what the State would have to prove." *Porter II*, 2013 WL 119730, at *3. The court did not expressly reject the claims in the analysis section of its opinion, likely because the petitioner appeared to have abandoned them by not raising them in the appellate brief, and also because the petitioner's concession that trial counsel had explained to him what the state would have to prove negated the factual basis for the claim as well as any possibility of establishing prejudice. (*See* Post-Conviction Hr'g Tr. at 21:16–24, ECF No. 45-20, at 24.)

Regardless of whether this claim is deemed to have been completely exhausted, it is clear that the petitioner is not entitled to relief, because he admitted that counsel explained to him the elements of the offenses and what the state would have to prove.

### 4.    Claim 6

In this claim, the petitioner argues that trial counsel was ineffective for failing to review with him the redacted video of his police interview or to discuss the possibility of its being used as evidence. In support of this claim, the petitioner points out that his trial counsel testified that the first time he heard the petitioner say that he was at the house where the crimes were committed was "after the case had been tried and the jury went out to deliberate and . . . Mr. Porter talked with a reporter. (Post-Conviction Hr'g Tr. 43: 2–6, ECF No. 45-20, at 56.) The petitioner argues that this statement contradicts the attorney's previous statement at the hearing that he had sat down and watched the videotape both with the petitioner and by himself during which he made notes to review elements with the petitioner, and the video show the petitioner admitting to being at the house.

The petitioner raised this claim in the amended petition for post-conviction relief (ECF No. 45-19, at 74); both he and his trial attorney were asked about the video extensively during the hearing. The post-conviction court rejected the claim, finding that the petitioner's testimony was not credible. The petitioner argues that the trial court's decision to credit the trial attorney's testimony was unreasonable in light of the attorney's contradictory statements.

The post-conviction appellate brief did not address this claim except by referencing generally all eighteen errors raised in the amended petition. (Post-Conviction App. Br., ECF No. 45-21, at 7 ("Appellant contends the cumulative errors of trial counsel rise beyond ineffective assistance of counsel and also calls into question the reliability of the outcome. Appellant outlined, with specificity, eighteen (18) total errors he attributed to trial counsel in his amended petition for post-conviction relief. TR 72–74.").) The Tennessee Court of Criminal Appeals summarized the evidence presented at the hearing concerning the video but did not expressly address the claim in the analysis section of its opinion.

The Court concludes that this claim was not fully exhausted by being properly presented to the Tennessee Court of Criminal Appeals during the post-conviction appeal. Notwithstanding the failure to properly exhaust, no avenue for raising the claim in the state courts remains available to the petitioner. He is barred from presenting it in the state courts by Tennessee's one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a), and by Tennessee's one-petition rule governing the filing of post-conviction petitions, Tenn. Code Ann. § 40-30-102(c). He does not argue that any of the circumstances enumerated in Tenn. Code Ann. § 40-30-117(a) permits him to re-open his post-conviction petition in the Tennessee courts. The claim is therefore considered to be exhausted (because no further state review is available) but procedurally defaulted, and may not be considered by the federal court on habeas review unless the petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional error, or alternatively that failure to consider the claim will result in a "fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

The petitioner here fails to acknowledge that this claim is defaulted and, even if he had, fails to show that he was remotely prejudiced by trial counsel's failure or, accordingly, by post-conviction counsel's failure to preserve the claim. Insofar as he argues generally that *Martinez* should save any claims that are procedurally defaulted, this argument is unavailing. As discussed above, *Martinez* provides only that the ineffective assistance of post-conviction counsel at the initial-review level may provide cause to excuse the default of a substantial claim of ineffective assistance of trial counsel. *Martinez*, 132 S. Ct. at 1318. *Martinez* does not contemplate that the ineffective assistance of post-conviction *appellate* counsel can supply "cause" for the default of a claim of ineffective assistance of trial counsel. Because this claim was raised in the amended petition and explored at the post-conviction hearing, *Martinez* does not apply. The petitioner is not

entitled to relief on the basis of this claim.

### 5. Claims 7 and 8

The petitioner claims his counsel was constitutionally ineffective for failing to interview or to offer at trial the testimony of Taneisha Robinson and Josh Blattner, both of whom the petitioner claims could have offered "potentially favorable" testimony. (ECF No. 1, at 12.) The petitioner argues that Ms. Robinson could have testified that he was wearing gray sweatpants and boots on the night in question, contrary to the victim's statement during the preliminary hearing that the perpetrator of the rape was wearing gray sweatpants and blue and white Sketcher shoes. (*Id.* at 13 (citing Preliminary Hr'g Tr. 24, 34–35).)[4] The petitioner argues that Ms. Robinson could have testified that he had never owned or worn blue and white Sketchers. He further claims that Josh Blattner would have testified that a third party known as Von was the person who tied up and raped the victim. (ECF No. 1, at 14.)

The petitioner did not raise these precise arguments in the state courts. In the post-conviction hearing, the petitioner stated that Ms. Robinson could have testified about "what she did and did not say to the detectives," and that "Davon Dodd was going to be the witness on the clothes and the Sketcher shoes that the person had on, that the woman who did this to her had on. Those were going to be my alibis as far as that part." (Post-Conviction Hr'g Tr. 23:6–13, ECF No. 45-20, at 26.) He was asked about whether he had seen a statement by Josh Blackner (Blattner) prior to trial. The petitioner stated that he had not, but that he had seen a written statement by him after trial. Counsel did not inquire regarding what that statement said.

In his post-conviction appellate brief, counsel for the petitioner argued only that trial counsel failed even to speak to Taneisha Robinson or investigate what her testimony might have been prior to the commencement of the trial and did not even remember the name Josh Blattner, and therefore that his failure to call them to testify could not have been the result of informed pretrial preparation or strategic choice. (Post-Conviction App. Br., ECF No. 45-21, at 10–11.) The Tennessee appellate court rejected the petitioner's ineffective-assistance claim arising from trial counsel's failure to call these witnesses at trial, based on post-conviction counsel's failure to call them as witnesses at the post-conviction hearing:

This Court has made clear that a claim of ineffective assistance of counsel arising from the

---

[4] The transcript of the preliminary hearing is not in the record before this Court. Even if it were, the petitioner offers only his own hearsay testimony regarding what Ms. Robinson would have said if she'd been called to testify.

> failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. Without the alleged witnesses' testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome.

*Porter II*, 2013 WL 1197730, at *10 (internal citation omitted).

This Court likewise finds that the petitioner has failed to show that the state courts' decision involved an unreasonable application of the *Strickland* standard. *Cf. Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) ("The conclusion of both the state trial court and the state court of appeals, that there was no proper evidence to support Petitioner's claim [regarding what the witness's testimony would have been if he had testified], was not contrary to or an unreasonable application of clearly established law." (citing 28 U.S.C. § 2254(d)(1)).

Moreover, although counsel failed to call the proposed witnesses to testify, the issue was fully litigated at the hearing, and the petitioner failed to establish that his trial attorney was ineffective. The trial attorney testified at the hearing that he spoke with Ms. Robinson, confirmed that she could not offer alibi evidence and that her testimony would not assist the petitioner's case, and made an affirmative decision not to call her to testify. The petitioner has not established that his trial attorney's decision not to call Ms. Robinson as a witness fell below the standard of reasonableness. Regarding Blattner, even assuming that the attorney was ineffective for failing to speak to or interview this witness, Blattner's statement to the police did not exonerate the petitioner or negate the fact that the petitioner admitted on videotape that he was one of the men who entered the victim's house and that had sexually assaulted the victim.[5] Thus, even if he could establish ineffective assistance, he cannot establish prejudice.

The petitioner is not entitled to relief on the basis of these claims.

### 6. Claim 9

In this claim, the petitioner asserts that his trial counsel failed to properly support the motion to suppress the petitioner's pretrial statement to police with a memorandum citing the "best-evidence rule" and referring to the petitioner's academic background and documented difficulty in understanding complex matters.

---

[5] A copy of Blattner's statement is attached as an exhibit to the petitioner's motion to rehear in the Tennessee Court of Criminal Appeals. (ECF No. 45-24, at 43.) Blattner's statement implicated Salon Von but did not exonerate the petitioner. (*See id.* ("Salon Von . . . told me more than once that [Chris] Pierce [Pearce] was going to get it for beaten [sic] him up at Ron Starr's poker game. . . . Then later on in that evening he called me again [and said] he's leaving [Pearce's] bitch wife tied up.").)

The "best-evidence" portion of this claim overlaps to some extent with Claim 6, above, which concerned the use of the redacted videotape at trial. Otherwise, the claim was not raised in the post-conviction appeal and is procedurally defaulted.

The petitioner did appeal the trial court's rejection of his claim that trial counsel was ineffective for failing to raise the petitioner's intellectual limitations as a basis for suppressing his confession as not truly voluntary. In considering this issue, the Tennessee Court of Criminal Appeals stated as follows:

> The Petitioner's next ineffective assistance claim is that trial counsel failed to provide a brief at the suppression hearing regarding the Petitioner's "inability to comprehend proceedings and procedures." The State, in response, avers that trial counsel was not ineffective because trial counsel presented evidence regarding the Petitioner's education at the suppression hearing. In denying the Petitioner relief, the post-conviction court found that the Petitioner failed to "submit his academic record" or "call any witness to testify regarding his alleged inability" or his academic record.

> Turning to the deficiency prong, the Petitioner testified at the post-conviction hearing that he made available to trial counsel his academic record because of his learning disability as well as the names of people who could discuss it. However, to the Petitioner's knowledge, trial counsel never spoke with those individuals. He stated that he completed the twelfth grade and was enrolled in special education classes. Trial counsel testified that he believed the videotaped statement to be "a crucial part of the case," which was why he sought to have it suppressed. He recalled telling the Petitioner, however, that suppressing the video would be difficult "because the officers conducted it in such a friendly manner." Moreover, the Petitioner's mother had informed trial counsel about the Petitioner's educational background and learning disability. As a result, trial counsel was particularly careful to help the Petitioner understand what he explained to the Petitioner. He knew that the Petitioner understood because the Petitioner would later relay the information to "other people."

> Once again, the evidence does not preponderate against the findings of the post-conviction court. The Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we do not need to address the prejudice prong. Accordingly, the Petitioner is entitled to no relief on this basis.

*Porter II*, 2013 WL 1197730, at *10–11.

The Court finds that the state court's decision was not contrary to or an unreasonable application of clearly established law. The petitioner has failed to establish that he is entitled to relief on the basis of this claim.[6]

### 7.    *Claims 10 through 18*

The petitioner raises nine separate claims related to the introduction of DNA evidence at trial: failure

---

[6] Moreover, as the respondent argues, the videotape of the petitioner's police interview further substantiates, as a factual matter, the trial court's conclusion that the petitioner was able to comprehend proceedings. In the videotape, the petitioner appears alert, engaged, and articulate. His responses and questions demonstrate that he understood what the police officers were asking.

to obtain DNA testing on a cigar found at the crime scene as recorded in Officer Jamie C. Murphy's October 2, 2008 report (Claim 10); failure to investigate the chain of custody of the DNA evidence presented at trial (Claim 11); failure to prepare for the state's presentation of DNA evidence (Claim 12); failure to challenge the sufficiency of the evidence by failing to be prepared to offer evidence related to the DNA of twins (Claim 13); failure to conduct voir dire of the state's DNA experts (Claim 14); failure to challenge the evidence linking the petitioner to the discarded ski mask (Claim 15); failure to challenge errors in the laboratory reports regarding where the items submitted for DNA testing were found (Claim 16); failure to raise the issue of new DNA evidence that would have eliminated the petitioner as a donor of the DNA found on the evidence presented at trial (Claim 17); and failure to follow through with the issue raised in the December 5, 2008 motion or to file additional motions to conduct independent analysis of the clothing found near the scene of the crime (Claim 18).

The petitioner raised all these claims in his amended post-conviction brief, but in his post-conviction appellate brief, he argued only that his counsel had not discussed with him prior to trial the importance of DNA evidence, the admissibility of DNA evidence, or the admissibility of DNA expert testimony. He also stated that counsel did not inform him of "subsequent DNA evidence that was presented after his convictions" (Post-Conviction App. Br., ECF No. 45-21, at 12), which he only learned about after going to prison. The petitioner further argued that counsel had told him he would engage his own DNA expert, which he failed to do. Counsel failed to have any independent testing done of the items found near the crime scene with the petitioner's DNA on them. The petitioner pointed out that counsel admitted that he did not undergo additional training or seek information to prepare him to deal with the DNA reports and other evidence at trial, and that the motion for a new trial did not contain any reference to supplemental DNA evidence provided post-trial indicating the presence of another person at the scene. In response, the state pointed out that trial counsel also testified that it was a calculated strategic decision not to question the validity of the DNA evidence admitted at trial, because the evidence matched the DNA of both the petitioner and his identical-twin brother, leaving reasonable doubt as to whether the brother rather than the petitioner might have been the actual perpetrator of the rape.

In considering these claims related to the DNA evidence, the Tennessee appellate court deferred to the trial court's credibility assessment and concluded that the petitioner had failed to establish that his counsel's performance was deficient. The court ruled as follows:

The Petitioner also asserts that trial counsel failed to discuss with him "the importance of DNA evidence, the admissibility of DNA evidence, or the admissibility of DNA expert testimony." The State responds that it was the calculated decision of trial counsel not to question the validity of the DNA evidence because the evidence, which matched the DNA of either the Petitioner or the co-defendant, cast doubt on the Petitioner as the perpetrator. The post-conviction court found that, because the Petitioner failed to support these claims regarding DNA evidence with any evidence other than his own testimony, the Petitioner failed to establish these allegations.

Turning to the deficiency prong, the evidence does not preponderate against the post-conviction court's findings. At the post-conviction hearing, the Petitioner denied that trial counsel ever discussed with him a cigar found at the crime scene. On cross-examination, however, he could not explain the cigar's significance as to the case or this proceeding. He remembered that DNA evidence was presented at trial but stated that he never discussed the admissibility of such evidence with trial counsel prior to trial. He was unaware until after his conviction of other DNA evidence of which trial counsel was aware. The Petitioner recalled trial counsel filing a motion for new trial but did not know at what point trial counsel became aware of this DNA evidence. He denied discussing anything with trial counsel related to his motion for new trial.

On cross-examination, the Petitioner acknowledged that he was wearing a toboggan at the scene, but he did not believe the toboggan to be "good evidence" because the toboggan revealed the DNA of either the Petitioner or the co-defendant, given that they were twins. The Petitioner believed that a specialist could have analyzed the DNA to discern whose DNA was on the toboggan. He relayed the information about this purported specialist to trial counsel, but he stated that trial counsel did nothing with this information.

Trial counsel testified that he discussed with the Petitioner the DNA on the toboggan matching the Petitioner and the co-defendant. He specifically remembered discussing that they could highlight to the jury the fact that "the State couldn't prove that it was him or his brother. Just one or the other." Trial counsel was not aware of technology that could differentiate the DNA of identical twins.

At the conclusion of the post-conviction hearing, the post-conviction court found the Petitioner's testimony wholly lacking credibility. Once again, we will defer to the post-conviction court's credibility findings in these matters. The Petitioner has failed to establish deficient performance on the part of trial counsel in this regard. Thus, we need not address the prejudice prong. Accordingly, the Petitioner is entitled to no relief on this basis.

Porter, 2013 WL 1197730, at *11 (internal citations omitted).

The state court's holding was not unreasonable or contrary to law. This Court further notes that, even if counsel's performance had been deficient, the petitioner has utterly failed to show how he was prejudiced by his counsel's treatment of the DNA evidence. DNA was found on a ski mask and perhaps on a cigar located near the scene of the crime. The ski mask tested positive for the petitioner's DNA, which meant that it also could have been his identical twin brother's. The petitioner contends that it is possible to distinguish between the DNA of identical twins, and he appears to believe that the absence of his DNA on either of these items would have been exculpatory. Notwithstanding, the petitioner admitted, on videotape, to having been at the

scene and to having worn one of the ski masks. The presence or absence of DNA evidence on any items found near the scene of the crime was therefore irrelevant: Its presence corroborated his confession to being at the scene; its absence would only suggest that the particular item tested for the presence of DNA had been worn or used by other people but would not negate the petitioner's confession to having gone into the victim's house. For the same reasons, the possibility of distinguishing between the petitioner's and his twin brother's DNA would not have made a difference to the outcome of this case. The petitioner is not entitled to relief on the basis of any of the DNA-related claims.

### B. Claims Raised in *Pro Se* State Post-Conviction Petition and Motion for Rehearing

As previously indicated, the petitioner filed a *pro se* petition for post-conviction relief on August 5, 2011, which incorporated an attachment to the petition entitled "Additional Grounds." (ECF No. 45-19, at 3, 11). The Additional Grounds articulated seventeen claims of ineffective assistance of trial and appellate counsel. Appointed counsel later filed an amended petition that did not expressly incorporate by reference the claims in the original petition and Additional Grounds, but it did not expressly supersede the first petition either. Counsel also did not develop any facts to support the "Additional Grounds" during the post-conviction hearing or present any argument concerning them, nor did he raise them in the post-conviction appeal. Shortly after the Tennessee Court of Criminal Appeals denied relief, the petitioner filed a *pro se* Rule 39 Petition for Rehearing in the Tennessee Court of Criminal Appeals in which he cited *Martinez v. Ryan*, raised a number of claims based on the ineffective assistance of trial and post-conviction counsel, and also expressly incorporated the same claims raised in the Additional Grounds. The Tennessee court denied the petition, stating only: "Upon review, we conclude that the Appellant is not entitled to relief under *Martinez v. Ryan*. . . ." (ECF No. 45-25.) The petitioner raised the same claims in his Rule 11 application for permission to appeal to the Tennessee Supreme Court, but that application was denied as well. (ECF Nos. 45-26, 45-27.)

In his petition in this Court, the petitioner again articulates the same claims raised in his Additional Grounds. They are identified in the petition as Issues (1) through (17), and enumerated by the Court as Claims 19 through 34.[7] The vast majority—in fact all but two—of these claims are patently without merit and subject to dismissal regardless of whether they are deemed exhausted and regardless of what standard of review

---

[7] The petition presents seventeen "issues," but combines "Issues (3) and (4)" into one claim. (ECF No. 1, at 19.)

applies, as discussed below.

### 1.    Claim 19

In Claim 19 ("Issue (1)"), the petitioner argues that his trial counsel was ineffective for arguing at the suppression hearing that "the post indictment statement should be redacted from Mr. Porter's video-taped statement to the detectives . . . but *then* failed to preserve this same issue" in the motion for a new trial or in the appeal. (ECF No. 1, at 19.) The petitioner cites to a specific portion of the transcript of the hearing on the motion to suppress, where trial counsel argued vaguely that the police officers made statements during their interview of Mr. Porter that could be construed as improper, for instance by referencing the charges pending against the petitioner in Murfreesboro, letting the petitioner know they were aware of that case, and suggesting that they could help the petitioner with the DA if he told his side of the story. (*See* Motion to Suppress Hr'g Tr. 85:15–87:5, ECF No. 45-6, at 88–90.)

The Court concludes, first, that this claim is not adequately pleaded under Rule 2(c) of the Rules Governing § 2254 Cases, as it does not adequately explain the grounds for relief or the facts supporting the grounds. However, while the basis for this claim is unclear, in his original *pro se* petition for post-conviction relief, the petitioner argued in support of the claim that the police officers' deliberate inducement of "post indictment statements from a suspect in the absence of counsel" violated *Massiah v. United States*, 377 U.S. 201 (1964).

This argument is without merit. *Massiah*, in which police officers surreptitiously induced the defendant to talk to a police agent about charges on which the defendant had already been indicted, does not apply here. The Smyrna police officers' actions were not surreptitious, and the officers did not induce the petitioner to talk about the charges on which he had already been indicted. Moreover, the officers gave the petitioner a *Miranda* warning and reminded him that he did not have to speak to them. The petitioner is not entitled to relief on the basis of this claim.

### 2.    Claim 20

In Claim 20 ("Issue (2)"), the petitioner insists that his trial counsel was ineffective for failing to object under Rule 404(b) of the Tennessee Rules of Civil Procedure to the admission of "statements related to then indicted charges" obtained in violation of *Massiah v. United States*, 377 U.S. 201 (1964). This claim obviously overlaps to a substantial extent with Claim 19. Again, *Massiah* does not apply.

The respondent interprets these claims as arising from the fact that the complete videotape of the petitioner's police interview contained a reference to the petitioner's separate rape charge in Murfreesboro, with respect to which an indictment had apparently already been handed down. The respondent points out that, although the original videotape contains the reference to the Murfreesboro charges, the redacted video that was shown to the jury did not include any reference to the Murfreesboro charges. Consequently, the respondent argues that the petitioner cannot show either that his counsel's performance was deficient or that he was in any way prejudiced by the reference to the Murfreesboro charges in the original videotape. The Court agrees that the petitioner is not entitled to relief on the basis of this claim.

### 3.     Claim 21

In "Issues (3) and (4)," the petitioner asserts that his Sixth Amendment right to counsel at trial and on appeal was violated when his attorney failed "to investigate and submit mental health and high school records at the evidentiary hearing on the motion to suppress." (ECF No. 1, at 19–20.) This claim substantially overlaps with Claim 9, which post-conviction addressed during the hearing and raised on appeal. For the same reasons set forth in connection with that claim, the petitioner is not entitled to relief on the basis of this claim.

### 4.     Claim 22

The petitioner claims ("Issue (5)") that his trial counsel was ineffective for failing to raise an objection under Tennessee Rule of Evidence 403. Although the petitioner does not specify in his habeas petition what evidence he believes his trial counsel should have moved to exclude or show how he was prejudiced, it appears from the similar claim set forth in his original post-conviction and Rule 39 petitions that he believes counsel should have objected to the jury's seeing only a redacted version of the videotaped police interview, instead of the entire, unredacted version.

Rule 403 countenances the exclusion of relevant evidence if necessary to avoid prejudice, confusion or waste of time. The Court understands the petitioner to be arguing that the redacted videotape should have been excluded on the basis that it was more prejudicial and confusing than the entire original video would have been. As the respondent argues, the original videotape was redacted primarily for the purpose of removing references to the petitioner's separate rape charges that were pending in Murfreesboro at the time of his interview. Obviously, preventing the jury from learning of the other charged offense did not prejudice petitioner. In addition, the petitioner does not point to any redacted portion of the videotape that is particularly

different from what the jury saw or that shows his police interview was coercive. Indeed, the original videotape does not support the petitioner's claim that the interview was coercive; it shows that the police were calm, cordial, and non-combative throughout the interview. And, although the videotape was redacted, the unredacted version was only twelve minutes shorter than the original two-hour-long video, giving the jury ample opportunity to judge whether the police were coercive.[8] The petitioner is not entitled to relief on the basis of this claim.

### 5.    Claim 23

The petitioner insists that his trial counsel was ineffective for failing to request that the prosecution elect which offense it was submitting to the jury ("Issue (6)"). (ECF No. 1, at 26.) The petitioner does not provide any argument or explanation in support of this claim, but in his motion for rehearing, he argued that, although he was charged in the indictment on only one count of aggravated rape, the prosecutor elicited testimony about three separate acts of alleged aggravated rape. (*See* Motion for Rehearing, ECF No. 45-26, at 40; Trial Tr. Vol. I, at 17–20, ECF No. 45-3, at 20–23 (victim's testimony).)

The state prosecutor informed the trial court that it was electing the act of digital penetration during the jury charge conference. (*See* Trial Tr. Vol. II, at 74:6–10, ECF No. 45-4, at 77 (electing act of digital penetration.) As a result of that election, the judge struck from the draft jury instructions any reference to sexual intercourse, cunnilingus, fellatio, and anal intercourse, and instructed the jury that, to find the petitioner guilty of rape, they had to find that the defendant had unlawful sexual penetration of the victim, with "sexual penetration" defined as "any other intrusion, however slight, of any part of a person's body into the genital opening of the alleged victim." (*Id.* at 74:11–23; ECF No. 45-4, at 77; *see also* Jury Charge, ECF No. 45-1, at 118.) The petitioner was only convicted on one rape count. The petitioner has not met his burden of establishing ineffective assistance or prejudice, and he is not entitled to relief on the basis of this claim.

### 6.    Claim 24

The petitioner claims that trial counsel was ineffective for failing to object when the trial court improperly used Tennessee Rule of Criminal Procedure 24(f)(2)(a) and eliminated the only African American juror from the body of jurors deliberating and deciding the case ("Issue (7)"). (ECF No. 1, at 26.) The petitioner

---

[8] The original videotape of the interview was just over two hours in length. (*See* Motion to Suppress Hearing Exh. 3 and Trial Exh. 52, filed separately.) The redacted version of the videotape, consisting of two DVDs, was approximately one hour and forty-eight minutes long. (*See* Trial Exhs. 53, 54.)

does not include any argument in support of this claim in his petition. Based on his motion for rehearing, he appears to oppose the trial judge's method of selecting the alternate juror.

The Tennessee Rules of Criminal Procedure provide that, before jury selection begins, the court "may call and impanel one or more jurors in addition to the regular jury of twelve persons." Tenn. R. Crim. P. 24(f). These jurors must "be drawn in the same manner, have the same qualifications, be subject to the same examination and challenges, take the same oath, and have the same functions, powers, facilities, and privileges as the regular jurors." Tenn. R. Crim. P. 24(f)(1). Thereafter, trial courts in Tennessee may choose between two methods of determining which of the jurors will function as alternates, either before trial or after trial. The judge in this case chose the after-trial method, the rule governing which states:

> During jury selection and trial of the case, the court shall make no distinction as to which jurors are additional jurors and which jurors are regular jurors. Before the jury retires to consider its verdict, the court shall select by lot the names of the requisite number of jurors to reduce the jury to a body of twelve or such other number as the law provides. A juror who is not selected to be a member of the deliberating jury shall be discharged when that jury retires to consider its verdict.

Tenn. R. Crim. P. 24(f)(2)(A).

The judge in the petitioner's case followed this method. He impaneled fourteen jurors. At some point during trial, one of those jurors was released, leaving thirteen who sat through the entire trial. At the close of proceedings, the judge randomly drew the name of one juror to function as the alternate. The juror whose name was selected happened to be the only African American impaneled with the original fourteen. The petitioner appears to be arguing that the judge, instead of drawing the name of one person to be the alternate, should instead have drawn the names of the twelve persons to be seated on the jury. He claims that the method employed by the judge "systematically worked against him" (ECF No. 45-26, at 43) and that trial counsel was ineffective under *Strickland* for failing to object to that method.[9]

The judge, in fact, selected "by lot" the name of one juror—the number required to reduce the jury to a body of twelve—in accordance with the applicable rule. (Trial Tr. Vol. III, at 2, ECF No. 45-5, at 5.) There is simply no merit to the petitioner's claim, and the petitioner is not entitled to relief on the basis of this claim.

_____

[9] Trial counsel did object to the designation of Ms. Marable, the only African American juror, as an alternate. The trial court overruled the objection on the basis that the drawing of her name was random and there was nothing he could do about it. (Trial Tr. Vol. II, at 3–4, ECF No. 45-5, at 6–7.)

### 7.    Claim 25

The petitioner claims that trial counsel was "was ineffective for failing to object to the jury selection process and argue that the State violated the Equal Protection Clause of the venires in Rutherford County, Tennessee, for a significant period of time, when one total population of Rutherford County to the proportion serving as jurors" [sic] ("Issue (8)"). (ECF No. 1, at 27.) While the claim as articulated here is unintelligible, the petitioner argued in his original post-conviction petition and in his motion for rehearing that

> Defense counsel was ineffective for failing to object to the jury selection process and argue that the State violate[d] the Equal Protection Clause . . by excluding African American women from the venires in Rutherford County, Tennessee, for a significant period of time, when one compares the proportion of African American females in the total population of Rutherford County to the proportion serving as jurors.

(ECF No. 45-19, at 33.)

The petitioner's claim appears to be premised solely upon the fact that only one African American woman was originally impaneled on the jury and that she happened to be the person whose name was drawn to be the alternate. The petitioner does not appear actually to have any evidence that African American women were categorically excluded from jury venires in Rutherford County, Tennessee at the time of his trial. He admits that his trial attorney was not in possession of any research or evidence that African American women were being excluded from jury venires in Rutherford County. Without such evidence, counsel could not have reasonably objected to the make-up of the jury panel and was not ineffective for failing to do so.

Again, the petitioner is not entitled to relief.

### 8.    Claim 26

The petitioner claims that counsel was ineffective for failing to object during trial to the jury-selection process and failing to argue on appeal that the trial court did not follow proper procedures in ruling on the *Batson* challenge ("Issue (9)"). (ECF No. 1, at 27.) Although the petitioner argues about the procedure for reviewing a *Batson* claim, he continues to attack the selection of Ms. Marable as the alternate who was released from the jury just prior to deliberations.

In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause guarantees "that the State will not exclude members of [the defendant's] race from the jury venire on account of race or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Id.* at 86. However, *Batson* concerns the use of peremptory strikes to exclude jurors. It does not concern the

random elimination of a juror as an alternate. The petitioner is not entitled to relief on the basis of this claim.

### 9. Claim 28

The petitioner argues ("Issue (11)") that his attorney was ineffective for failing to argue in the direct appeal that the evidence was insufficient to support the verdict, because the only collaborating evidence to support the petitioner's confession "came from Detective Liehr's testimony concerning the unexplained, inconsistent and uncorroborated pretrial statement of the petitioner." (ECF No. 1, at 27.)

The issue is patently without merit. It is true, as the petitioner states, that a Tennessee rule of law provides that contradictory statements by a witness in connection with the same fact cancel each other. *Taylor v. Nashville Banner Pub. Co.*, 573 S.W.2d 476, 482 (Tenn. Ct. App. 1978). However, the cancellation rule applies only when the inconsistency in a witness's testimony is unexplained and when neither version of his testimony is corroborated by other evidence. *Id.* at 483. In this case, the inconsistency in the petitioner's own statements is explained by the petitioner's desire not to get caught. Further, there was evidence introduced at trial to corroborate the petitioner's confession, including the victim's statements about what happened to her and the ski mask with the petitioner's DNA on it. The petitioner cannot establish that he was prejudiced by his attorney's failure to raise this argument. He is not entitled to relief on the basis of this claim.

### 10. Claim 29

The petitioner argues that trial counsel was ineffective for failing to object to the jury's hearing the redacted version of petitioner's police statements or to argue that the "best evidence rule" was violated when the jury heard the redacted version ("Issue (12)"). (ECF No. 1, at 27.) This claim is largely redundant of the petitioner's other objections to the introduction of the redacted videotape instead of the unedited version. For the reasons previously stated, the petitioner cannot establish that he was prejudiced by the jury's being shown the redacted version. He is not entitled to relief on the basis of this claim.

### 11. Claim 30

The petitioner claims that trial counsel was ineffective for failing to object to the trial court's failure to follow the guidelines set forth in Rule 30.1 of the Tennessee Rules of Criminal Procedure when the court decided not to allow the videotaped interview of petitioner to go to the jury ("Issue 13"). (ECF No. 1, at 27.) There is no evidence in the record that the redacted videotape was *not* permitted to go to the jury room with the jurors or that they requested and were denied the ability to review any portion of the videotaped interview

during deliberations. This claim is without merit.

### 12. Claim 31

The petitioner claims his trial attorney was ineffective for failing to require the trial court to give adequate jury instructions explaining the DNA evidence as it pertains to twins ("Issue 14"). (ECF No. 1, at 28.) Because the testimony at trial indicated that both the petitioner and his twin brother were present at the scene of the crime and were both wearing ski masks, it was irrelevant whether there was technology available that might have distinguished between them. This claim is without merit.

### 13. Claim 32

In his "Issue (15)," the petitioner claims that trial counsel was ineffective for failing to appeal after objecting to the admission of Detective Liehr's testimony about his interview of Taneisha Robinson as hearsay evidence in violation of petitioner's Fifth, Sixth, and Fourteenth Amendment rights. (ECF No. 1, at 28.) The petitioner did not identify which statements by Detective Liehr constituted improper hearsay, in either his petition in this Court or in his Rule 39 motion. This Court's review of Detective Liehr's testimony reveals that counsel objected at one point to a question on the basis that the answer would elicit hearsay. The prosecutor rephrased the question and did not ask any other questions that required or elicited a hearsay statement from Taneisha Robinson in response. (*See* Trial. Tr. Vol. II, at 33–58, ECF No. 45-4, at 36–61.) This claim is without merit.

### 14. Claim 34

The petitioner claims that his trial attorney was ineffective for failing to file a motion to stay proceedings while he pursued a petition for the writ of error coram nobis on the issue of the admissibility of additional DNA evidence ("Issue (17)"). (ECF No. 1, at 29). The petitioner argues that, months after trial, it was discovered that one of the pieces of evidence turned up during the investigation of the crimes at issue here had DNA on it from Phountamine Sounivong, the "Salon Von" the petitioner had maintained all along was present and had actually perpetrated the rape. As discussed above in connection with the petitioner's other DNA-related claims, this evidence, if presented at trial, would not have assisted the petitioner, because it does not negate the fact that another piece of evidence recovered at or near the scene of the crime—a ski mask—had the petitioner's (or his twin brother's) DNA on it. Nor does it negate the fact that the petitioner admitted to being in the victim's house wearing a ski mask while the crimes were committed. The petitioner

is not entitled to relief on the basis of this claim.

### 15. *The Two Remaining Claims – Claims 27 and 33*

In Claim 27, the petitioner argues that counsel was ineffective at the sentencing hearing and on appeal for failing to argue, under the Fifth and Fourteenth Amendments, that the petitioner's multiple convictions should merge into one conviction ( "Issue (10)") (ECF No. 1, at 27). He also argues that his post-conviction counsel was ineffective for failing to address this issue in the initial-review proceedings or to argue it on appeal. This claim was raised in the initial post-conviction petition (ECF No. 45-19, at 38) and in the motion for rehearing (ECF No. 45-26, at 47).

The respondent asserts that, insofar as it pertains to the ineffective assistance of *appellate* counsel, this claim was not fully exhausted in the petitioner's state-court proceedings because, although it was raised in the petitioner's "Additional Grounds" attached to his *pro se* post-conviction petition, which was cross-referenced in the petition for rehearing, the petitioner did not make a specific claim of ineffective assistance of *appellate* counsel in the body of his Rule 39 petition for rehearing. The respondent further argues that *Martinez* does not provide an avenue for overcoming the default of a claim of ineffective assistance of appellate counsel. *See Hodges v. Colson*, 727 F.3d 517, 531 (6th Cir. 2013) ("Under *Martinez*'s unambiguous holding . . . ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel.").

The respondent also argues that, to the extent a portion of the claim was fully exhausted by being presented to the Tennessee Court of Criminal Appeals in the petitioner's Rule 39 petition, *see Thomas v. Fortner*, No. 3:08-cv-0274, 2009 WL 649733 (M.D. Tenn. March 11, 2009) (Echols, J., adopting magistrate judge's Report and Recommendation)*,* it is not sufficiently pleaded under Rule 2 of the Rules Governing § 2254 Cases and is subject to dismissal on that basis. However, although the petitioner did not elaborate upon this argument in his petition in this Court, in his initial post-conviction petition and in his petition for rehearing, the petitioner argued that his trial attorney was ineffective for failing to argue under *State v. Dixon*, 957 S.W.2d 532, 535 (Tenn. 1997), that the trial court should set aside the kidnapping convictions as violative of due process, because the confinement of the victim(s) was not beyond that necessary to accomplish either the aggravated rape or aggravated robbery. The respondent addresses the merits of this argument only by

insisting that an objection based on *Dixon* would have been futile even if made at the appropriate time. [10]

It appears to be an open question in the Sixth Circuit as to whether it would be more appropriate under the circumstances presented here to deem the claim to be procedurally defaulted or exhausted. The Sixth Circuit has not expressly considered whether *Martinez* and *Trevino* apply when the alleged ineffectiveness of post-conviction counsel occurs at the "initial-review" level but consists, not in failing altogether to raise a claim but instead in failing to support the claim with a coherent argument or evidence at the evidentiary hearing. Certainly, a post-conviction attorney who lists a claim but then fails to support it leaves his client just handicapped as if the claim were never raised at all, since the client by himself does not have the ability to present witnesses or proof to support the claim and typically lacks the legal sophistication to present a coherent argument to support it, at the trial or appellate level. Courts considering this issue have come out on both sides. *Compare, for example*, *Haight v. White*, No. 3:02-CV-P206-S, 2013 WL 5146200, at *8 (W.D. Ky. Sept. 12, 2013) ("*Martinez* is clear that errors by post-conviction attorneys in collateral proceedings that rise to the level of ineffective assistance of counsel may be sufficient to establish cause for a procedural default of an ineffective assistance of trial counsel claim. That is so whether the post-conviction attorney

---

[10]     Although the law in Tennessee concerning dual convictions for kidnapping and an underlying offense such as rape or robbery has continued to evolve, at the time of the petitioner's conviction, the Tennessee Supreme Court had held that a separate conviction for kidnapping may stand based on "any restraint in addition to that which is necessary to consummate rape or robbery." *Dixon*, 957 S.W.2d at 535. And it was the trial court's job to determine in the first instance "whether the movement or confinement was beyond that necessary" to commit the accompanying felony. *Id.* If so, the trial court must then ascertain "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." *Id.* Shortly before the petitioner's conviction in this case, the Tennessee Supreme Court reaffirmed and clarified the holding in *Dixon*. *State v. Richardson*, 251 S.W.3d 438 (Tenn. 2008).

In 2012, after Porter's conviction had become final, the Tennessee Supreme Court again confirmed that, under Tennessee law, kidnapping was to be punished as a separate offense "only [in] those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." *State v. White*, 362 S.W.3d 559, 577 (Tenn. 2012). That portion of the holding did not deviate substantially from the prior holdings in *Dixon* and *Richardson*, but the court went further: It concluded that the due-process concerns implicated by a kidnapping conviction that did not have such separate criminal significance were more properly addressed in the first instance to the jury rather than to the trial and then appellate courts: "[W]e have concluded that whether the evidence, beyond a reasonable doubt, establishes each and every element of kidnapping, as defined by statute, is a question for the jury properly instructed under the law. The jury, whose primary obligation is to ensure that a criminal defendant has been afforded due process, must evaluate the proof offered at trial and determine whether the State has met its burden." *Id.* at 577 (citations omitted). Although it overruled *Dixon* and *Richardson* in part to reach that conclusion, the court expressly noted that the holding did not "articulate a new rule of constitutional law or require retroactive application." *Id.* at 578. Consequently, the holding of *White* does not apply to the petitioner's case, because his conviction became final on direct review in 2011, before *White* was issued.

entirely failed to raise the claim or raised the claim, but did so in a manner that was insufficient to meet prevailing professional standards."); *and Horonzy v. Smith*, No. 1:11-cv-00235-EJL, 2013 WL 3776372, at *2 (D. Idaho July 16, 2013) (noting that, if "initial post-conviction counsel . . . failed to adequately develop the facts and seek an evidentiary hearing," this failure "would be within the *Martinez* exception"); *with Henderson v. Carpenter*, 21 F. Supp. 3d 927 (W.D. Tenn. 2014) (rejecting the petitioner's argument that "it is 'irrational' to distinguish failing to properly assert a federal claim and failing to properly develop the claim in state court" and holding that *Martinez* does not apply "where post-conviction counsel failed to develop the evidentiary basis for a claim of ineffective assistance during the initial review proceedings"); *and Dorsey v. Denney*, No. 4:08-CV-2005 (CEJ), 2013 WL 451642, at *2 (E.D. Mo. Feb. 6, 2013) (where the petitioner argued under *Martinez* that "post-conviction motion counsel was ineffective for raising petitioner's claim of ineffective assistance of trial counsel, but then failing to fully develop the record regarding this claim at the evidentiary hearing," holding that *Martinez* did not apply because, "[i]n this case, there was no procedural default of the claim. While the record was not developed as thoroughly as petitioner desired, the claim was raised.").

In short, it is unclear (1) whether the claim (or a portion of it) is procedurally defaulted and (2) what standard of review applies. For purposes of *Martinez* at least, the claim warrants further consideration, as there is a possibility that the petitioner was prejudiced by the failure of any of the petitioner's attorneys to raise this claim in prior proceedings. The petitioner received two consecutive ten-year sentences for kidnapping, to be served consecutively to a twenty-two year sentence for rape, but it does not appear that the trial court at any time was asked to perform a *Dixon* analysis.

The Court further finds that the appointment of counsel to brief this claim, addressing whether the claim is defaulted and what standard of review should apply, would be helpful to the Court.

Likewise, in Claim 33, the petitioner asserts that his trial attorney was ineffective for failing to file a motion to stay proceedings while he pursued a petition for the writ of error coram nobis regarding an allegedly exculpatory statement made by the victim during the sentencing hearing ("Issue (16)"). (ECF No. 1, at 28). He also claims that his post-conviction attorney was ineffective for failing to argue this issue in the trial court or to raise it on appeal.

More specifically, the petitioner presents affidavits from two of his family members stating that they overheard the rape victim at the sentencing hearing state to her husband, when she heard the petitioner

testify, "That's not him." (ECF No. 1, at 28.) The petitioner speculates that the victim "apparently recognized that Mr. Porter had a very bad pronounced speech impediment and that the person or persons who did the rape did not have this identifying characteristic." (*Id.*) The transcript of the hearing on the motion for a new trial reflects that the petitioner's trial attorney mentioned to the court that he had received a letter from the defendant's mother a few days before the hearing informing him that there were "witnesses willing to testify that Mrs. Pearce told her husband that Elgene was not the person who sexually assaulted her." (Motion for New Trial Tr. 7:11–14, ECF No. 45-8, at 10.) He told the court: "So that just came to my attention, Your Honor. I don't know if that may be something that needs to be examined in a motion for a new trial or if a motion needs to be filed to present new evidence to the court." (*Id.* at 7:15–20.) The court responded that it was up to trial counsel how he wanted to handle it. Trial counsel did not have any proof to present at that time, but he did not raise the issue later either. Regarding this claim too, the Court finds that additional briefing would be helpful.

Accordingly, the Court will appoint counsel to represent the petitioner who shall provide additional briefing to the Court as to these two claims, specifically addressing whether the claims are procedurally defaulted and what standard of review applies. The respondent will be given the opportunity to respond.

VI.    **CONCLUSION**

For the reasons set forth herein, the Court will deny with prejudice all claims stated in petitioner Elgene Porter's § 2254 petition except those claims identified herein as claims 27 and 33 (the petitioner's Issues (10) and (16)). Counsel will be appointed to brief these claims. Because the order entered in conjunction with this memorandum is not the final appealable order, the Court will not address at this juncture the issue of whether to grant a certificate of appealability.

An appropriate order is filed herewith.

_Todd Campbell_

Todd Campbell
United States District Judge